UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JIMMIE T. BELL,

                  Petitioner,                  **DECISION AND ORDER**
                                                        **No. 01-CV-6509(VEB)**

     -vs-

VICTOR T. HERBERT,

                  Respondent.
_____

## I.  INTRODUCTION

      Petitioner, Jimmie T. Bell ("Bell"), proceeding *pro se*, filed a petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his April 26, 1995 conviction in New York

State Supreme Court (Erie County). This case was transferred to the undersigned for decision by

order of Magistrate Judge Marian Payson entered December 21, 2006. *See* Docket No. 23. The

parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. §

636(c).

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

      On August 18, 1994, an Erie County Grand Jury returned an indictment charging Bell

with one count of rape in the first degree (N.Y. Penal Law § 130.35(1)) and one count of criminal

possession of a weapon in the third degree (N.Y. Penal Law § 265.02(1)). The charges stemmed

from Bell's forcible rape of the complainant, Lisa Zdeb, on July 1, 1994, at a motel in the City of

Buffalo.

      The Buffalo Police Department first became involved in the incident on July 3, 1994,

when they responded to a report of a fight. When Officers Maroney and Lynch arrived on the

scene, they observed between fifteen and twenty white males attacking a black male, later

identified as Bell. T.191.[1] After breaking up the fight, the officers spoke to one of the assailants,

Eric Toye ("Toye"), who informed them that he and his friends had attacked Bell because Bell

had raped Toye's friend, Lisa Zdeb ("Zdeb").  T.181, 186. The officers thereafter escorted Bell to

the police station and commenced an investigation into the alleged rape. T.192. Zdeb provided

the police with details of the rape, which had occurred two days before the fight, on July 1, 1994.

Bell eventually was arrested in connection with the incident.

     Zdeb testified that she was from Derby, New York, originally, but at the time of the

incident, she had no permanent address. She had been staying with different friends in Buffalo,

and even living on the street. T.81-82. Zdeb testified that Bell approached her on July 1, 1994,

while she was at Topic, an outdoor café on Allen Street in the City of Buffalo. T.83. Bell began a

conversation with her and ultimately asked if she wanted to get coffee with him at Bakerman's.

T.85-86; 119-20. After they had been chatting for a while, Toye approached the café and joined

them. The three then proceeded to walk towards Bakerman's café. T.85-87; 126; 175-76. As they

were walking, they encountered a group of Toye's friends who were walking on the opposite side

of the street. T.90. Toye crossed the street to speak with them as Zdeb and Bell waited. After

several minutes, Bell suggested that they hail a cab and continue without Toye. T.90-92; 132-34;

176-77.

     Instead of going directly to the café, however, Bell directed the taxi driver to stop at the

corner of West Huron and Niagara Streets. T.92. Once there, Zdeb and Bell exited the taxi. Bell

---

[1]        Citations to "T.__" refer to the trial transcript.

told Zdeb to wait for him, and he walked around the corner. Zdeb did not recognize the neighborhood she was in, and did not know how to get back to Allen Street. T.93-94; 136. Very few people were on the street and she felt scared. T.94; 137. A few minutes later, Bell reappeared and asked Zdeb is she would come inside to help him carry something. Zdeb agreed, assuming that the "something" to which Bell was referring was drugs. T.93-95.

The two walked around the corner and entered a building, which Zdeb initially said resembled a delicatessen. T.145. Once inside, Zdeb realized that it was not a restaurant; there was a clerk behind a desk and a hallway with doors on either side. T.95-97. Zdeb accompanied Bell to a room at the end of the hall. They entered the room, which contained a bed, a television, and a nightstand. Bell turned on the television so that the volume was very loud, and began to threaten Zdeb. He ordered Zdeb to undress and removed her shirt. T.98. After she removed her clothes, Bell forced her to get onto the bed. T.97-99. Bell then began to pull down his pants, at which point Zdeb realized that Bell was holding a knife in his left hand. T.100. Bell vaginally raped Zdeb, while holding the knife against her neck. T.99-101. Bell told her to "shut up" because she was crying. T.102.

After he was done assaulting her, Bell told Zdeb to get dressed and that she had better stop crying and not tell anyone about what had happened. T.103-04. Zdeb donned her clothes, and Bell then escorted her outside, where he hired another taxi. Zdeb related their conversation in the cab: "[W]e got in the cab and he told me he was going to drop me off where he found me, and just kept threatening me not to tell anyone, and he just said if I told anyone he'd be watching me and he'd come after me if he heard anything, and he said he'd been having his friends watch me because he had told them about my lip ring[.]" T.105. Bell told her that he knew where she

"hung out" and had seen here there before. T.106. Bell instructed the taxi driver to drop Zdeb off

at the corner of Elmwood and Allen Streets, and Zdeb walked back to the Topic café. T.107; 159.

Toye, Zdeb's friend, testified that he saw Zdeb speaking with Bell in front of the Topic

café on the day of the rape. Toye recounted that Zdeb pulled him aside and asked him to have

coffee with her and Bell at Bakerman's. T.176. Toye agreed and started to walk with them

toward Bakerman's, but he saw another friend on Elmwood Avenue and went on ahead. T.176-

77; 183. When he turned around, Bell and Zdeb were no longer in sight, so he went back to the

Topic café. T.184. Later that evening, he saw Zdeb walking on Allen Street toward the Topic

café. Zdeb was crying and shaking, and she told him she had been raped. T.107; 178-79. Toye

testified that he encouraged Zdeb to report the rape to the police and to seek medical attention.

T.180. Zdeb related that she did neither because she was scared and ashamed. T.107; 163.

Two days later, Zdeb was at the Topic café when she heard and saw Bell nearby. T.108.

Toye was with her, and he saw Bell, too. Toye ran after Bell and, along with some of his friends,

beat Bell until the police broke up the fight. T.180-81.  The evening of the fight (July 3, 1994),

was the first time that either Zdeb or Toye discussed the rape with the police.

The jury returned a verdict on March 7, 1995, convicting Bell on both counts in the

indictment. T.302. On April 26, 1995, Bell was sentenced as a persistent felony offender to

concurrent sentences of twenty years to life in prison for the rape conviction, and three and one-

half to seven years for the weapons possession conviction. Bell's conviction was unanimously

upheld on direct appeal by the Fourth Department. *People v. Bell*, 234 A.D.2d 915 (App. Div. 4th

Dept. 1996). Leave to appeal was denied on March 7, 1997. *People v. Bell*, 89 N.Y.2d 1009

(N.Y. 1997). Bell prosecuted a collateral motion to vacate the judgment pursuant to New York

Criminal Procedure Law ("C.P.L.") § 440.10 in Erie County Supreme Court on December 21, 1999. *See* Exhibit D, Respondent's Exhibits. Justice Forma denied the application in a written decision and order on April 17, 2000. *See id.* The Appellate Division, Fourth Department, denied Bell's application seeking leave to appeal on October 31, 2000. *See id.* Although the Fourth Department's order was not appealable, Bell nevertheless sought leave to appeal to the New York Court of Appeals. This was denied as a matter of a law. *See id.*

Calculating Bell's date of filing pursuant to the prisoner mailbox rule,[2] Bell's habeas corpus petition was filed on October 9, 2001, the date he signed it. *See* Petition (Docket No. 1). Respondent answered the petition and interposed the affirmative defense of untimeliness and, in the alternative, argued that Bells claims were procedurally defaulted or lacking in merit. *See* Respondent's Memorandum of Law (Docket No. 13). For the reasons set forth below, the Court finds that the petition is untimely and must be dismissed.

## III.   DISCUSSION

### A.   Timeliness of the Petition

Because Bell's habeas petition was filed after the enactment of the Anti-terrorism and Effective Death Penalty Act ("AEDPA") on April 24, 1996, it is subject to a one-year statute of limitations that runs from the *latest* of the following four events:

(A) the date on which the judgment became final by the conclusion of direct

---

[2]      *See Houston v. Lack*, 487 U.S. 266, 276 (1988) (holding that a *pro se* prisoner's notice of appeal is deemed filed on the date that the prisoner "deliver[s] it to the prison authorities for forwarding to the court clerk," rather than when it is received by the court clerk). "Absent evidence to the contrary, the Court assumes that [the prisoner] gave his petition to prison officials for mailing on the date he signed it." *Torres v. Irvin*, 33 F. Supp.2d 257, 270 (S.D.N.Y. 1998) (citing *Hunter v. Kuhlman*, 97 Civ. 4692, 1998 WL 182441, at *1 n. 2 (S.D.N.Y. Apr. 17, 1998) (deeming petition filed on date on which petitioner signed it); *Hughes v. Irvin*, 967 F. Supp. 775, 778 (E.D.N.Y. 1997); *Jones v. Artuz*, No. CV 97-2394, 1997 WL 876735, at *1 (E.D.N.Y. Sept. 13, 1997)); *accord Johnson v. Coombe*, 156 F. Supp.2d 273, 277 (S.D.N.Y. 2001)

review or the expiration of the time for seeking such review;
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C.§ 2244(d)(1)(A) - (D).

### 1.    Calculation of Timeliness Using Section 2244(d)(1)(A)

For most petitioners, Section 2244(d)(1)(A) sets the applicable starting point for the one-year period of limitations. If that standard is applied to Bell's situation, his petition is clearly untimely:  Bell's conviction was affirmed by the Appellate Division on December 30, 1996. Leave to appeal to the New York Court of Appeals was denied on March 7, 1997. Bell had ninety (90) days from March 7, 1997, in which to file a petition for a writ of *certiorari* with the Supreme Court seeking further review of his state court conviction. June 5, 1997, the day on which that ninety-day period expired, is the date his conviction became final for purposes of 28 U.S.C. § 2244(d). Where, as here, a state prisoner does not seek certiorari, the conviction becomes final no later than the expiration of the ninety-day period for filing such a petition. *See Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir.), *cert. denied*, 534 U.S. 924 (2001); *see also* S. Ct. R. 13(1) (establishing 90-day period for filing petition for writ of *certiorari*).  Thus, Bell had one year from June 5, 1997–*i.e.*, at the latest, June 5, 1998–to either file his habeas petition pursuant to 28 U.S.C. § 2254, or file a collateral attack in state court.[3] Bell did not file his petition until

---

[3]        AEDPA provides for a tolling of the limitations period during the time that "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment of claim is pending. . . ." 28 U.S.C. § 2244(d)(2).

October 9, 2001, more than three years after the one-year period of limitation expired on June 5, 1998. Furthermore, Bell's C.P.L. § 440.10 motion does not operate to toll the running of the limitations period, since it was filed over a year *after* the statute of limitations expired. Thus, Bell's petition clearly is untimely if the date his conviction became final is used as the starting-point for the one-year period of limitations.

### 2.      Section 2244(d)(1)(d) and Claims of  "Newly Discovered Evidence"

When a petitioner asserts a claim of "newly discovered evidence," however, Section 2244(d)(1)(D) allows for a later start to the limitations period–namely, the "date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

### a.)      The "Newly Discovered Evidence"

The "new evidence" which Bell claims to have discovered are "thirteen (13) pages of reports" ("the Reports") received pursuant to a F.O.I.L. request from the Buffalo Police Department ("the B.P.D.") and four (4) pages of handwritten notes by an unidentified author which he received pursuant to a F.O.I.L. request from the Erie County District Attorney's Office ("the E.C.D.A."). *See* Handwritten Notes ("the Notes"), attached as Exhibit A to Petitioner's Exhibits in Support of Petition for Writ of Habeas Corpus (Part One) (Docket No. 3). Bell contends that the Reports "establish a crime scene location <u>other</u> than the crime scene location established by the District Attorney during these proceedings." Petitioner's Facts in Support of Equitable Tolling at 2 (Docket No. 18) (emphasis in original); *see also* Exhibit D ("13 Pages of Disclosed Documents/Buffalo Police Dept."), to Petitioner's Exhibits in Support of Petition for Writ of Habeas Corpus (Part One) (Docket No. 3). However, Bell elsewhere has conceded that

defense counsel, prior to trial, had the thirteen (13) pages of reports from the B.P.D. *See* Petitioner's Facts in Support of Equitable Tolling at 20 (Docket No. 18) ("[B]ecause without the [handwritten] notes, all defense counsel could have had from any police agency (B.P.D. or E.C.D.A.) is 13 pages of documents from B.P.D., which they allege comprise its complete file on the case . . . with the address of the Huron Hotel[.]").

The Reports, dated July 3, 1994, indicate that the crime occurred at 76 West Huron Street. The Notes, written by an unidentified author, describe a visit to the "Lake Motel," which is located at 201 West Huron Street.  However, a question arises as to whether the Notes actually constitute "newly discovered evidence." When Justice Forma denied Bell's December 21, 1999 C.P.L. § 440.10 motion, he explicitly rejected Bell's argument that the Notes were newly discovered evidence, or, in the alternative, potentially exculpatory material that should have been disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

Justice Forma observed that the Notes, dated July 8, 1994, appear to "memorialize[ ] Lisa Zdeb's description of the room in which the rape occurred, the writer's subsequent entry into Apt. #5 of the "Lake Motel", and his/her description of that room." *See* Order Denying C.P.L. § 440.10 Motion, Exhibit D, Respondent's Exhibits. Bell "relie[d] upon the fact that the Lake Hotel is located at 201 W. Huron Street, which is near the intersection of **Niagara and W. Huron Streets**." *Id.* (emphasis in original). Bell "contrast[ed] the foregoing with the victim's statement of July 3, 1994[,] reflecting that the rape occurred in a building 'at the corner of **W. Huron and Franklin' Streets**, and Buffalo Police Department records, also bearing that date, stating that the rape occurred at 76 W. Huron Street." *Id.* (emphasis in original). In addition, at the preliminary hearing held on July 8, 1994, the victim testified that she was raped in a building

containing apartments located at the corner of West Huron and Franklin Streets. *Id.* The victim ruled out the possibility that the premises were located on Niagara Street, which, Bell argues, implicitly rules out the Lake Hotel as the location of the crime. *Id.* In contrast to the victim's statement and preliminary hearing testimony, the prosecution's bill of particulars indicated that the rape occurred at West Huron and Niagara Streets. *Id.*

Justice Forma also found that at trial, the victim's testimony established that "she had been a resident of Derby, New York and had moved to Buffalo only a few weeks prior to the commission of the crime." *Id.* The victim, then twenty years-old, "was in effect a homeless person spending her days on the streets of Allentown [sic]." *Id.* Justice Forma noted that although she testified that Bell had instructed the taxicab driver to proceed to the corner of "West Huron and Niagara," the victim admitted that she did not know the name of the street where she and Bell got out of the cab, or its location relative to Allentown [sic]. *Id.* (citing T.93-94; 134; 137).

On cross-examination, the victim was shown photographs of a building which bore the sign, "Lake Hotel." She positively identified the building depicted in the photograph as the crime scene. T.150. She also stated that on July 8, 1994, police detectives and an individual named "Sam," who possibly was employed by the District Attorney's office as an investigator, transported her to several locations in an effort to identify the crime scene. *See* T.154-55. At that point, the victim identified the Lake Hotel as the site of the crime. *See* T.149-55. As noted above, the Lake Hotel was located on the corner of Niagara and West Huron Streets. Trial counsel impeached the victim with her police statement of July 3, 1994, and her testimony at the preliminary hearing, both of which reflected that she believed the rape had occurred in a building located on the corner of Franklin and West Huron Streets. Trial counsel also established that her

identification of the Lake Hotel, while in the company of the police detectives, preceded the

preliminary hearing. During his summation, trial counsel emphasized the victim's inconsistent

testimony regarding the location of the crime, as well as the absence of physical evidence

corroborating that a sexual assault had occurred. Trial counsel argued that the victim's account of

the events in question "was incredible and fabricated for the purpose of appeasing her

boyfriend[.]" *See* Order Denying C.P.L. § 440.10 Motion, Exhibit D, Respondent's Exhibits.

> In light of the foregoing, Justice Forma concluded that it was

> therefore clear that the record contain[ed] sufficient facts to have permitted review
> of the Defendant's claims that the prosecution manipulated the facts to create 'an
> alternative crime scene', and that defense counsel suborned perjury, was in
> collusion with the prosecutor, and/or failed to provide effective assistance. The
> handwritten notes, although obtained subsequent to the appeal, simply corroborate
> facts that [we]re already in the record.

*Id.* In sum, Justice Forma concluded, the handwritten notes "[did] not constitute new evidence,

since they [we]re merely cumulative to the testimony of the victim, and their introduction into

evidence at a new trial would not probably change the result[.]" *Id.* (citation omitted).

The Notes, received from the Erie County District Attorney's office, were not, as the

C.P.L.§ 440.10 court held, "newly discovered evidence." *See United States v. Middlemiss*, 217

F.3d 112, 122 (2d Cir. 2000) ("Relevant factors to a successful motion [for new trial based on

newly discovered evidence] are whether (1) counsel could not have discovered the evidence with

due diligence before or during trial; (2) the evidence demonstrates that a witness in fact

committed perjury; (3) the new evidence is material; and (4) the new evidence is not

cumulative.") (citing *United States v. White*, 972 F.2d 16, 20-21 (2d Cir. 1992)). Furthermore, by

definition, newly discovered evidence is incapable of discovery through counsel's due diligence

before or during trial. *See United States v. Middlemiss*, 217 F.3d at 122 (holding that affidavit

from a new witness was not newly discovered evidence because trial counsel knew of the

existence of the witness before trial; trial counsel with due diligence could have discovered the

evidence). Contrary to Bell's contention, the Notes were not material to his conviction on the

charge of rape; as the prosecution pointed out in its affirmation in opposition to Bell's C.P.L. §

440.10 motion, "[l]ocus [wa]s not an element of the crime for which defendant was convicted."

Furthermore, as the prosecutor noted, and "[i]t was never a secret that the victim was from out of

town and was unfamiliar with the location where defendant raped her at knife-point." *Id.*

Moreover, the Notes, which merely show that the Lake Hotel apparently was visited during an

investigation into the crime, were cumulative to other evidence with which trial counsel

impeached the victim and highlighted her inconsistent testimony regarding the place the rape

occurred. *See*, *e.g.*, *Williams v. Phillips*, No. 04 Civ.4653 DAB AJP, 2005 WL 1806161, at *10

(S.D.N.Y. Aug. 2, 2005) (Report & Recommendation) (rejecting claim that petitioner was

entitled to later start-date under 28 U.S.C. § 2244(d)(1)(D); where petitioner was aware of a

cooperating witness' psychiatric and criminal history at the time of trial and counsel extensively

witness on those subjects, and knew that the witness  had received over $3,000 in relocation

expenses from the District Attorney's Office, even if he did not know the actual amount allegedly

was $10,000; under those circumstances, affidavits from the witness' family members regarding

his drug abuse, mental health issues, and arrest record were not "newly discovered evidence"

and, "'[a]t best, would have afforded defense counsel additional grounds on which to impeach

prosecution witnesses whose credibility had already been vigorously challenged. . . .") (quoting

*United States v. Canova*, No. 03-1291(L), 03-1300, 2005 WL 1444147 at *13 (2d Cir. Jun. 21,

2005)). This Court agrees with the state court that the evidence was not newly discovered.

### b.)      Calculation of Timeliness Under Section 2244(d)(1)(D)

However, for the sake of argument, the Court will assume that the Notes constitute newly discovered evidence to allow Bell to obtain the benefit of a later start to the statute of limitations under Section 2244(d)(1)(D). The relevant date for determining when to start the clock running is therefore the date "on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Courts in this Circuit have held, in the context of this so-called "newly discovered evidence" provision of AEDPA, that the limitations period "'runs from the date a petitioner is on notice of the facts which would support a claim, not from the date on which the petitioner has in his possession evidence to support his claim.'" *Lucidore v. New York State Div. of Parole*, No. 99 Civ. 2936(AJP), 1999 WL 566362, at *5 (S.D.N.Y.  Aug. 3, 1999) (quoting *Youngblood v. Greiner*, 97 Civ. 3289, 1998 WL 720681, at *4 n. 4 (S.D.N.Y. Oct. 13, 1998) and citing *Flanagan v. Johnson*, 154 F.3d 196, 198-99 (5th Cir. 1998) (petitioner's factual predicate that he did not know he had the right not to testify was established when he first executed an affidavit setting forth the legal and factual basis for his claim; "Section 2244(d)(1)(D) does not convey a statutory right to an extended delay, in this case more than seven years, while a habeas petitioner gathers every possible scrap of evidence that might . . . support his claim.")), *aff'd*, 209 F.3d 107 (2d Cir. 2000), *cert. denied*, 531 U.S. 873 (2000); *accord Hector v. Greiner*, No. 99 CV 7863 FB, 2000 WL 1240010, at *4 (E.D.N.Y. 2000); *Foy v. Sabourin*, No. 02 Civ. 7094(DLC), 2004 WL 574655, at *3 (S.D.N.Y. 2004); *Brown v. Keane*, No. 97 CIV. 3302(MBM), 1998 WL 148334, at *3 (S.D.N.Y. 1998). The Court, again, assumes for the sake of argument that Bell was not put on

notice of the facts supporting his claim until the date he received the handwritten notes from the

Erie County District Attorney's Office; according to Bell, this was March 12, 1998. *See*

Petitioner's Memorandum of Law at 3 (Docket No. 11) Respondent, on the other hand, asserts

that the notes were provided under cover of a letter dated January 27, 1998. *See* Respondent's

Memorandum of Law at 9 (Docket No. 13).

Even giving Bell the benefit of the doubt and treating March 12, 1998, as the

commencement of the one-year limitations period under 28 U.S.C. § 2244(d)(1)(D), the petition

is still untimely. One year from March 12, 1998, is March 12, 1999. Thus, Bell would have had

to have filed his federal habeas petition on or before March 12, 1999. In the alternative, Bell

could have tolled the limitations period by filing a collateral attack on his conviction in state

court on or before March 12, 1999. *See* 28 U.S.C. § 2244(d)(2).  However, Bell did neither.

Instead, Bell waited until December 21, 1999, before he filed his C.P.L. § 440.10 motion based

on the "newly discovered evidence" (*i.e.*, the Notes received from the Erie County District

Attorney's Office). The one-year limitation period clearly had run before the date he filed his

C.P.L. § 440.10 motion; indeed, Bell waited over nine months after the limitations period expired

on March 12, 1999, before filing his C.P.L. § 440.10 motion on December 21, 1999. A state-

court collateral attack on a conviction cannot toll an already expired limitations period; nor does

a belatedly filed state-court collateral attack serve to start the limitations period running anew.

*See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) ("We therefore hold that proper

calculation of Section 2244(d)(2)'s tolling provision excludes time during which properly filed

state relief applications are pending but does not reset the date from which the one-year statute of

limitations begins to run."). Thus, Bell's C.P.L. § 440.10 motion did not serve to toll the already

expired statute of limitations.

Bell's habeas petition was not filed until October 9, 2001, over two years after the statute

of limitations expired on March 12, 1999. Furthermore, it was filed almost a complete year after

the Appellate Division denied leave to appeal the C.P.L. § 440.10 denial on October 31, 2000,

and his newly discovered evidence claim was fully exhausted. No matter how the dates are

construed, Bell's petition is clearly untimely.

**B.      Equitable Tolling**

Bell argues that he is entitled to equitable tolling with respect to the time period between

August 7, 1997, the date on which submitted his  F.O.I.L. requests to the B.P.D. and the

E.C.D.A., and December 21, 1999, the date on which he filed his C.P.L. § 440.10 motion. *See*

Petitioner's Memorandum of Law at 7-8 (Docket No. 11). Bell contends that "since August of

1997," he has been "attempting to acquire copies of documents from the Erie County District

Attorney through the New York State Freedom of Information law to no avail to wit(1) [sic]

copies of the investigation documents relating to the establishment of the crime in my criminal

case. Including all reports and memorandums with the name, job title, and business address of

the individual(s) who purported [sic] conducted an investigation at 201 West Huron – Lake

Hotel." *See* Petitioner's Facts in Support of Habeas Petition (Docket No. 18). Bell alleges that his

tardiness in pursuing his C.P.L. § 440.10 motion and in filing his federal habeas petition was

"created by the District Attorney's purposefully contrived dilatory answer to [his] F.O.I.L.

request in August, 1997."

Because AEDPA's one-year period has been construed as a statute of limitations rather

than a jurisdictional bar, federal courts may equitably toll the period. *See Smith v. McGinnis*, 208

-14-

F.3d at 17. Equitable tolling applies only in the "rare and exceptional circumstance." *Id.* (citation omitted).  In order to justify equitable tolling of the one-year period of limitations, the petitioner must show that "extraordinary circumstances" prevented him from filing his petition on time. *See id.* (citing *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (noting that the Second Circuit has applied equitable tolling doctrine "'as a matter of fairness' where a plaintiff has been 'prevented in some extraordinary way from exercising his rights . . . .' ") (citation omitted)). Furthermore, the petitioner seeking equitable tolling must have acted with "reasonable diligence" throughout the period he seeks to toll. *See id.* The petitioner furthermore must demonstrate a causal relationship "between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000); *Hizbullahankhamon v. Walker*, 255 F.3d 65, 76 (2d Cir. 2001). Hence, "[i]f the person seeking equitable tolling has not exercised reasonable diligence in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances therefore did not prevent timely filing." *Valverde*, 224 F.3d at 134.

Bell's principal complaint appears to be that the Erie County District Attorney's Office has never provided him with the name of the individual who authored the Notes which formed the basis of his C.P.L. § 440.10 motion urging *vacatur*. After receiving the Notes from the Erie County District Attorney's Office pursuant to F.O.I.L. in March 1998, Bell administratively challenged the adequacy of the E.C.D.A.'s response. On April 8, 1998, the Erie County District

Attorney's Office sent Bell a letter, advising him, in pertinent part, as follows:

> The only reports of the incident in our possession are the General Offense Report, and investigator's notes which you were already provided. We do not have an Investigator's Report of the Crime Scene or any other reports of the crime scene in our possession.
> The name of the investigator was not redacted from the previously provided notes. Your remaining requests concerning names of investigating officers and investigating agencies is not information subject to disclosure under the Freedom of Information Act [sic].

*See* Letter from Erie County District Attorney's Office to Petitioner dated April 8, 1998, attached as Exhibit O to Petitioner's Exhibits in Support of Petition for Writ of Habeas Corpus (Part Two) (Docket No. 3). Bell apparently then filed a Article 78 proceeding filed in Erie County Supreme Court on or about July 13, 1998, arguing that the reports were being withheld. In response, the Erie County District Attorney's Office submitted an affidavit on September 3, 1998, stating that it did not know the identity of the author of the Notes. *See* Exhibit B, Petitioner's Exhibits in Support of Petition for Writ of Habeas Corpus (Part One) (Docket No. 3). Corporation Counsel for the Buffalo Police Department also responded to the Article 78 petition, noting that the handwritten notes "appeared to be a statement taken by a private investigator from the owner of the Lake Hotel at West Huron Street on January 18, 1998 [sic]."[4] *See* Exhibit C, Petitioner's Exhibits in Support of Petition for Writ of Habeas Corpus (Part One) (Docket No. 3). According to Corporation Counsel, the "Buffalo Police Department has no record of taking any statement from Manyu Patel regarding the status of Room #5 in the Lake Hotel," as the Notes indicate. *Id.* Corporation Counsel further averred that there were no other records regarding Bell's case apart

---

[4]     It is apparent that this is a typographical error or misreading of the notes, which indicate a date of July 3, 1994. It would make no sense for an investigation to have been conducted some four years after the alleged rape on July 1, 1994.

from the thirteen (13) pages of reports that had been disclosed previously. *Id.*

On or about October 9, 1998, Erie County Supreme Court dismissed the Article 78 petition. *See* Order, attached to Petitioner's Facts in Support of Equitable Tolling (Docket No. 22). Bell continued to try to obtain the name of the person who authored the handwritten notes investigating the Lake Hotel as a possible situs of the crime. Although Bell was not satisfied with the answers he received from the Erie County District Attorney's Office and from Corporation Counsel for the Buffalo Police Department, he did nothing to challenge the "purposefully contrived dilatory answer to [his] F.O.I.L. request" until January 22, 2002, when he wrote to the Erie County District Attorney's Office, again requesting the "[n]ame, job title, and business address of the person(s), who investigated the crime scene, Lake Hotel, that was presented during the legal proceedings and at petitioner's trial." In his "Facts In Support Of Equitable Tolling" (Docket No. 18), Bell refers to an exchange of correspondence between him and the Erie County District Attorney's Office following his January 22, 2002 letter. This culminated in the District Attorney issuing a letter dated July 9, 2002, stating as follows: "Please be advised that the Freedom of Information Law requires only that applicants be shown non-exempt documents . . . ; it does not require the agency to answer the applicant's questions. Your request is that this agency answer the questions stated in your letter. Because your request does not fall under the statute, it is denied." *See id.* at 4 (Docket No. 18); *see also* Petitioner's Supplemental Response (Docket No. 14). On September 23, 2002, Bell filed his second Article 78 petition, still seeking information regarding the author of the handwritten notes.  A justice of the Erie County Supreme Court dismissed the Article 78 petition, finding that the E.C.D.A. stated that it had given Bell copies of all investigative notes it had, and that it did not have the name of the investigator who

-17-

had generated the July 1994 notes. *See* Erie County Supreme Court Order dated June 26, 2003, attached to Petitioner's Facts in Support of Equitable Tolling (Docket No. 22).The court found that Article 78 could not be used to compel an act which was not capable of performance. *See id.*

It is apparent that, based on the chronology detailed above, Bell has not acted with "reasonable diligence" throughout the time period he seeks to have tolled. There are simply too many unexplained and lengthy delays in Bell's state-court filings to allow this Court to find that he exercised "reasonable diligence" throughout the period he seeks to have tolled.

First of all, Bell states in a 2003 submission to this Court that after he filed his habeas petition in October 2001, "and the District Attorney failed to provide the name of the alleged author of the notes . . . [,] Petitioner then moved forward with a pending F.O.I.L. request against the District Attorney requesting to know the name of the person(s) who conducted the investigation of the crime scene[.]" Petitioner's Exhibits in Support of Habeas Petition (Docket No. 18). Bell states that the Erie County District Attorney "embarked on the same dilatory strategy of not answering or imposing unsupported exemption theories[,]" and he refers to correspondence exchanged between him and the District Attorney's Office throughout 2002. *See id.* (Docket No. 18). Thus, Bell's purported efforts to "move forward" with his second F.O.I.L. request did not commence until January 2002, nearly four years after he first received the initial, unsatisfactory F.O.I.L. responses from the E.C.D.A. and the B.P.D. on March 12, 1998.

Second, the Court notes that Bell received the information requested pursuant to F.O.I.L. at the latest on March 12, 1998; however, he did not begin attempting to exhaust his "newly discovered evidence" claim until December 21, 1999, when he filed his C.P.L. § 440.10 motion. Although he was pursuing an Article 78 proceeding challenging the response to his F.O.I.L.

request in 1998, Bell nevertheless could have filed his C.P.L. § 440.10 motion sooner so as to have tolled AEDPA's statute of limitations period. Bell states that he "unwittingly fell into the District Attorney's trap by waiting to file [his] 440 motion, which was due basically to [his] fear of not surviving procedural bar on the 440 application due to [his] not having the appropriate information to establish [his] claims." *See id.* Bell, however, did not need the name of the person who authored the Notes in order to establish the claims alleged in his C.P.L. § 440.10 motion. This conclusion is underscored by Justice Forma's denial of Bell's C.P.L. § 440.10 motion because the handwritten notes were not newly discovered evidence or potentially exculpatory material; rather, Justice Forma found, they were merely cumulative to other impeachment evidence that defense counsel had in his possession at the time of trial. Thus, the state court plainly did *not* deny the motion because Bell had failed to provide the name of the author of those notes. Furthermore, Bell has never satisfactorily articulated *why* having the name of the person who authored the Notes was of such paramount importance. Thus, Bell's argument to the effect that he was "trapped" into not filing his C.P.L. § 440.10 motion in a timely manner is wholly unpersuasive.

Third, there was a four-year delay between Bell's first Article 78 proceeding in late 1998 challenging the response to his F.O.I.L. request and his second Article 78 proceeding in September 2002, again alleging the District Attorney's Office failed to comply with its obligations under F.O.I.L.

Fourth, although Bell's C.P.L. § 440.10 motion was no longer pending on October 31, 2000, the date on which the Appellate Division denied leave to appeal, and his claims relating to the Notes were fully exhausted, Bell waited almost a full year before filing his federal habeas

petition on October 9, 2001. Moreover, he waited a year and three months after the denial of his

C.P.L. § 440.10 motion before resuming his efforts in January 2002 to obtain the name of the

author of the Notes from the District Attorney's Office.

In light of these unexplained and lengthy delays, Bell cannot demonstrate that he acted

with "reasonable diligence" throughout the period he seeks to have tolled. Furthermore, Bell's

alleged inability to obtain the name of the author of the handwritten notes does not constitute

"extraordinary circumstances" preventing from timely filing his habeas petition. *Padilla v.*

*United States*, Nos. 02 Civ. 1142, 94 CR. 313, 2002 WL 31571733, at * 4 (S.D.N.Y. Nov. 19,

2002) ("Even if [petitioner] did not have all the necessary materials or experienced a delay in

obtaining them, those are not extraordinary circumstances warranting equitable tolling."). *Davis*

*v. McCoy*, No. 00 CIV 1681, 2000 WL 973752, at * 2 (S.D.N.Y. July 14, 2000) (holding that the

inability to obtain documents [which] did not rise to the level of extraordinary circumstances

warranting equitable tolling). Even assuming for the sake of argument that the inability to obtain

the information at issue amounted to an "extraordinary circumstance," Bell has failed to

demonstrate any causal connection between the allegedly withheld information and the lateness

of his habeas petition. *See Lee v. Portuondo*, No. 02 CV 3990(SI), 2003 WL 22173078, at *5

(E.D.N.Y. Apr. 29, 2003) ("Assuming, for argument's sake, that the loss of petitioner's trial

records by his privately retained counsel is [an extraordinary circumstance for purposes of

equitable tolling], petitioner fails to demonstrate any causal connection between the lost papers

and the lateness of his filing of the instant petition. In particular, petitioner makes no effort to

explain why his state criminal records were necessary to advance any of the claims alleged in his

petition."); *Anderson v. O'Gara*, No. 01 Civ. 5712, 2002 WL 1633917, at * 5 (S.D.N.Y. July 23,

2002) (denying equitable tolling denied where, *inter alia*, the petitioner had not shown that his inability to obtain the transcripts prevented him from filing his habeas petition); *De La Rosa v. Keane*, No. 01 CV 4718, 2001 WL 1525257, at * 2 (E.D.N.Y. Nov. 13, 2001) (denying equitable tolling because petitioner did not need to have the trial minutes in his possession to advance his claim of ineffective assistance of counsel). The Court simply does not understand why Bell is fixated on obtaining the name of the author of the handwritten notes; it is, in fact, a "red herring." In other words, the name of the author of the Notes is immaterial to the claims raised by Bell.

Finally, Bell asserts that this Court should not "countenance such methods by the District Attorney which have the effect of denying defendants/petitioners their rightful access to the" federal courts, and he seeks an evidentiary hearing "to inquire into this matter more completely." No hearing is necessary here as the Court has not found that the Erie County District Attorney's Office engaged in any improper conduct.

## CONCLUSION

For the foregoing reasons, petitioner Jimmie T. Bell's request for a writ of habeas corpus is denied and the petition is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1); *United States v. Lozada*, 107 F.3d 1011, 1013 (2d Cir. 1997) (holding that, under 28 U.S.C. § 2253(c)(1), certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right).

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     February 26, 2007
           Rochester, New York.